Mulligan v. Emmett State Bank.

No. 27,795.

W. F. MULLIGAN et al., *Appellees*, v. THE EMMETT STATE BANK and
C. W. JOHNSON, as Receiver, etc., *Appellants*.

(261 Pac. 567.)

SYLLABUS BY THE COURT.

BANKS AND BANKING — *Distribution of Assets — Rights of Director-Creditors
Omitting Liability from Reports*. For several years before a bank failed,
the published reports of its financial condition, required by R. S. 9-121,
omitted from the statement of liabilities a liability to the directors as in-
dividuals, in a sum equal to two-fifths of the bank's capital. *Held*, that in
the distribution of assets by the receiver among creditors, payment of the
claim of the director-creditors should be postponed until the claims of de-
positors and other creditors, for whose benefit the statute was enacted, have
been satisfied.

Appeal from Pottawatomie district court; MARTIN A. BENDER, judge. Opin-
ion filed December 10, 1927. Modified.

*Chester A. Leinbach*, of Onaga, and *William E. Smith*, of Wamego, for the
appellants.

*A. E. Crane, B. F. Messick, A: Harry Crane*, all of Topeka, *E. C. Brookens,
E. S. Francis*, both of Westmoreland, and *W. J. Gregg*, of Frankfort, for the
appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one by directors of a failed bank
against the bank and its receiver, to recover judgment for a sum of
money which plaintiffs had paid to discharge a note they had given
for the bank's benefit, and to establish the claim as a common claim,
to be paid ratably from the bank's assets. Plaintiffs prevailed, and
defendants appeal.

G. H. Beeler was the holder of a time certificate of deposit for
$8,000 issued by the bank, and wished the bank to pay him a higher
rate of interest than the certificate bore. The bank was under obli-
gation to repurchase some Farmers Union notes which had been sold
to the Traders National Bank of Kansas City, Mo., and the Traders
Bank had indicated it might require repurchase of the paper at any
time. With affairs in this situation, and on April 23, 1920, the di-
rectors of the bank as individuals gave Beeler their promissory note
for $8,000, bearing interest at a rate satisfactory to Beeler, and
Beeler surrendered his certificate of deposit to the bank. An ac-

Banks and Banking, 7 C. J. p. 751 n. 68.

count in the bank known as the directors' fund was credited with $8,000. This fund had been established after consultation with officials connected with the banking department, for the purpose of taking up excess loans and bad paper with money borrowed by the directors. The Traders Bank did not return the Farmers Union paper until March 22, 1922. On that date, the directors' fund account was charged with a check for $8,000, and the Farmers Union paper was taken out of the assets of the bank. The bank paid interest on the Beeler note until October, 1925. The bank closed in May, 1926, and on August 6, 1926, the directors paid the note and accrued interest, amounting to $8,400.

One defense to the note was that the bank was insolvent when the Beeler note was given, and creation of the bank's obligation to pay the note, or to reimburse the directors, was forbidden by R. S. 9-163. That defense failed because the court found, on sufficient evidence, that the bank was solvent. Another defense was that the directors deceived the banking department by failing to show the liability of the bank with respect to the Beeler note in the verified quarterly reports to the bank commissioner. That defense failed because the evidence disclosed the banking department knew all the facts at least as early as March 8, 1924, and probably from the beginning. Another defense is more serious. The banking act contains the following provision:

"Every bank shall make at least four reports each year, and oftener if called upon, to the bank commissioner, according to the form which may be prescribed by him, verified by the oath or affirmation of the president or cashier of such association, and attested by the signature of at least three of the directors. Each such report shall exhibit in detail and under appropriate heads, the resources and liabilities of the association at the close of business on any past day by him specified, and shall be transmitted to the bank commissioner within ten days after the receipt of a request or requisition therefor from him, or within ten days after publication of the call for such statement in the official state paper, and shall be published in such form as the commissioner may prescribe, within ten days after the same is made out, in a newspaper published in the place where such bank is established, or, if there is no newspaper in the place, then in one published nearest thereto in the same county, at the expense of the bank; and such proof of publication shall be furnished within five days after date of publication, as may be required by the bank commissioner. The bank commissioner shall also have power to call for special reports from any bank whenever in his judgment the same are necessary in order to obtain a full and complete knowledge of its condition. The verification of such statement shall be made in the following form:

"State of Kansas, County of ————, ss.

"I, ———— ————, president [or cashier] of said bank, do solemnly swear that the above statement is true; that said bank has no liabilities, and is not indorser on any note or obligation, other than shown in the above statement, to the best of my knowledge and belief. So help me God.

(R. S. 9-121.)                           ———— ————, *President—Cashier.*"

The statements of the Emmett bank were duly published in the St. Marys *Star*, and the liability of the bank to pay the Beeler note, or to reimburse the directors if they paid it, did not appear in the statements. The purpose of the regulation was to give periodically, to those residing in the territory tributary to the bank, accurate information respecting its condition. Depositors and other creditors are invited to deal and to continue to deal with banks, relying on their published statements, and the statute was enacted for their special benefit. Directors are controlling and managing agents of the affairs of a bank, and it is their duty to see that published statements of its financial condition are correct. In this instance, a liability to directors as individuals equal to two-fifths of the bank's capital was omitted from its reports, and the directors are asking that they be paid on equal terms with depositors and other creditors.

On behalf of the directors it is urged that the liability of the bank to pay the Beeler note did appear in the published statements, because an equivalent of Beeler's certificate of deposit appeared in the directors' fund until the Farmers Union notes were taken up. Conceding this to be true, the liability did not appear after March 22, 1922. The concession, however, cannot be made. This note which the directors gave to Beeler was in effect a substitute for his certificate of deposit, and for all purposes of the case the note was the note of the bank. The testimony was that the directors' fund account was subject to check, the same as any other account in the bank. When the amount of the note was placed in the directors' fund the relation of debtor and creditor was established between the bank and the directors, and the bank then rested under two liabilities where but one had existed before. It was obliged to pay checks on the directors' fund account, the Beeler note constituted a liability, and the situation was the same as if the bank owed Beeler on his original certificate of deposit and on the note, too. Meanwhile, the bank rested under a third liability, the liability to the Traders Bank. The amount to the credit of the directors' fund was checked out to take up the Farmers Union paper, which was worthless and was

charged off. The liability to the directors as depositors was thus discharged, but the liability on the Beeler note remained.

The directors contend that, in perfectly good faith, they supplied a fund of $8,000, which was used for the benefit of the bank, and that they should be reimbursed out of the bank's assets. The contention is well founded as between the directors and the bank, and judgment was properly rendered in favor of the directors and against the bank and its receiver. The receiver contends, however, that the directors are estopped to claim payment out of the assets on an equality with depositors and other creditors, because of publication of the false statements. The directors reply that essential elements of estoppel are wanting. They did not intend to misrepresent, and there was no evidence that any depositor or other creditor did business with the bank relying on the published statements or any of them.

The statute required true statements of the bank's liabilities. As indicated, it was the duty of the directors to see that the statements were correct. They are to be judged by what they manifested objectively, and their mental attitude with respect to the publication of false reports is immaterial.

The cases dealing with apparent assets are numerous. This case involves apparent liabilities. The same principles apply in determining the two kinds of cases. Some of the earlier cases, which established the principles, are interesting.

In the case of *Skordal v. Stanton,* 89 Minn. 511, the syllabus reads:

"Where directors of a bank execute and deliver a promissory note, payable to its order, to make good an impairment of its assets, and that it may continue to do business, they cannot, upon the appointment of a receiver in insolvency proceedings, be allowed to assert as a defense that there was no consideration for the note, and that they were merely accommodation makers."

In the opinion the court disposed of a question of *res judicata,* and said:

"Even if this were not true, it is very evident, from the facts appearing, that Skordal has no claim upon funds in the hands of the receiver as against general creditors. The assets of the bank had become impaired, and, with other directors, he executed and delivered the note to make good the deficiency. He did this in order that the bank might keep its doors open and go on with its business. The bank continued to deal with depositors and others, all parties relying, undoubtedly, upon this, among other securities; and, when the assets are being collected for the purpose of meeting its obligations, Skordal cannot

Mulligan v. Emmett State Bank.

be heard to deny the validity of his note. As to creditors, he is estopped from asserting this defense." (p. 512.)

In the case of *Best v. Thiel et al.*, 79 N. Y. 15, a mortgage was given by a trustee of a savings bank to a mortgagee, who assigned to the bank. In an action by the receiver of the bank to foreclose the mortgage, the defense was want of consideration. In the opinion the court said:

"Second. The defendant is estopped from denying the legal validity of the mortgage. It was given expressly to make up the deficit in the assets of the bank and to enable it to go on with its business. It was reported to the banking department as a portion of the assets and was in effect represented to the depositors of the bank as a portion of the assets, and all this was done by the defendant and with his knowledge and assent. . . . It was in reliance upon this and the other securities given, that depositors were induced to make and leave deposits in the bank; and hence, upon the clearest principles of justice and morality, the defendant should be estopped from denying the validity of this mortgage." (p. 18.)

In the case of *Hurd v. Kelly*, 78 N. Y. 588, a bond was given at the request of bank officials to enable the bank to continue to do business. In the opinion the court said:

"He knew that if the bond was treated as an asset and the bank thereby allowed to continue its business, new obligations to depositors would be entered into on the faith of the solvency of the institution. Under such circumstances it would be gross injustice to permit the defendant, after having aided the bank to procure credit with the community, to avoid, as against depositors and creditors, the payment of his bond on the allegation that the exact condition of the bank was not disclosed to him, or that it was much worse than was represented. The dealings between him and the officials of the bank, at whose request he signed the bond, ought not, in justice, to be allowed to affect the security given by him for the protection of those dealing with the bank and who must be presumed to have relied thereon in their dealings." (p. 597.)

It is not likely that depositors and other creditors knew anything about the note in the Skordal case, the mortgage in the Best case, or the bond in the Hurd case, and the cases are squeezed into the equitable-estoppel compartment of the legal cabinet by assuming and presuming that in each instance depositors and creditors did rely on the specific paper involved as actually swelling the bank's assets, and as a result were induced to become or continue to be depositors and creditors. If in this instance the new wine is to be put into the old bottle of estoppel, we may presume the depositors and other creditors of the Emmett State Bank did business with it relying on

the published reports as truthfully exhibiting the full extent of its liabilities.

The presumption that depositors and other creditors did in fact rely on apparent assets or apparent liabilities takes the cases out of the orthodox category of equitable estoppel, but the terminology only is faulty; the result reached is sound. As indicated, keeping the doors of a bank open for business is a continuing invitation to the public to do business with it. The statute is based on the legislature's determination of the fact, presumably from experience, that periodical publication of sworn statements, exhibiting in detail and under appropriate heads the resources and liabilities of a bank, will be a guide to those who consider acceptance of the invitation, will be a protection to those who do accept the invitation, and misinformation will necessarily mislead. When a bank fails it would not be practicable to summon all depositors and other creditors, inquire who did read and rely on the statements, regularly, occasionally, or not at all, and adjust priorities in the distribution of assets according to the result of the inquiry. To do that would tend to render the statute nugatory. The statute implies public injury from its violation, as it implies public benefit from its observance. To count as a liability, in the distribution of assets among creditors, liability to a director-creditor, which he suppressed from the published statements, would defeat the policy of the statute, and payment to him must be postponed until those for whose benefit the statute was enacted are paid.

The judgment of the district court is modified to conform to the view just expressed.